**Shirwanda Sheri BOONE, Appellant (Defendant Below),**

**v.**

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 45S00–9903–CR–155.

Supreme Court of Indiana.

May 12, 2000.

Jeff Schlesinger, Appellate Public Defender, Crown Point, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

SHEPARD, Chief Justice.

Following a jury trial, Shirwanda S. Boone was found guilty of murder. The court sentenced her to a term of fifty-five years.

Boone presents three issues in this direct appeal:

I. Whether the trial court wrongly admitted evidence of a prior automobile chase involving Boone and the victim when there was no evidence that Boone was in control of the vehicle;

II. Whether the State met its burden of proving beyond a reasonable doubt that Boone did not act un-

der sudden heat at the time of the kill; and

III. Whether the trial court properly overruled defense objections to aggressive questions the prosecutor asked Boone during cross-examination.

### Facts and Procedural History

Kenneth Sutton and Shirwanda Boone had a turbulent relationship for five years; Sutton is the father of her son. Toward the end of the relationship, Boone had a growing suspicion that Sutton was involved with the victim, Cashmere Quinyette Campbell.

On December 1, 1997, Kenneth Sutton was shot and went to the hospital. Boone took on the responsibility of bathing Sutton before going to her work, but soon stopped doing so due to Campbell's disapproval. Boone had several encounters with Campbell during Sutton's stay at the hospital, one of which resulted in a verbal altercation. At one point, the argument became so heated that the nurse asked Boone and Ronda Sutton, Kenneth Sutton's sister, to leave.

Sutton permitted Campbell to use his white Cadillac. Boone fought with Campbell over the vehicle and once even had it towed. On February 5, 1998, Campbell left the hospital and went to Sutton's home to get some things he needed. When Campbell arrived, she argued with Boone, Ronda Sutton and two other women. When Campbell got into the Cadillac and left, Boone said to the others, "Let's get that bitch." (R. at 335.) Boone got a bat out of her vehicle, and the four ladies pursued Campbell. A high-speed chase ensued. Officer David Calarie testified that at about 10:33 a.m. in the 800 block of Kennedy Avenue he heard the "sound of braking, brakes squealing or tires squealing" and observed a young black woman exiting a white Cadillac yelling "Help me, help me." (R. at 227.) The officer could not determine who the actual driver was.

On the morning of February 14, 1998, police were called to Sutton's residence at 861 Carolina Street on dispatch of a disturbance involving a fight and handgun. Later in the evening, between 5:30 and 6 p.m., police went again to the same address for the same reason. Sutton, who was paralyzed, was upstairs yelling at Boone and Ronda Sutton, telling them to leave Campbell alone. Campbell later told the police that Boone had pointed a gun at her. The police searched the home for the gun, after obtaining consent from the grandmother who owned the home, to no avail.

The same day, Boone showed Ronda Sutton a .45 caliber handgun in a diaper bag and stated, "I'm go[ing to] get 'em." (R. at 299, 301.) In early February, Boone had illegally purchased a handgun from Darnell Hodge, allegedly to protect herself.

The next day, on February 15, 1998, Boone called Sutton's house and asked where her son was. Sutton stated "he was right there," but abruptly hung up. (R. at 849.) Boone became upset. She went to Campbell's house with a loaded gun and found Campbell on her way out the door. An argument erupted, and Boone shot Campbell.

### I. Evidence about the Earlier Auto Chase

Boone contends the trial court erred in admitting the auto chase into evidence, asserting that this past behavior was introduced to show character in conformity with the charged offense. Evidence Rule 404(b) provides in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Our standard for assessing the admissibility of 404(b) evidence is: (1) the

court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Spencer v. State,* 703 N.E.2d 1053 (Ind. 1999). The trial court has wide discretion in ruling on relevancy of evidence. *Hicks v. State,* 690 N.E.2d 215 (Ind.1997). If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence.

 The State's contention is that the car chase was not introduced to show conformity, but rather to show motive and intent. The intent exception in Evidence Rule 404(b) is available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. *Wickizer v. State,* 626 N.E.2d 795 (Ind.1993); Evid. R. 403. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. The trial court must then determine whether to admit or exclude such evidence depending upon whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." *Wickizer,* 626 N.E.2d at 799.

A leading ground for Boone's defense was her claim that the killing arose out of sudden heat, thus reducing the crime from murder to voluntary manslaughter. In light of Boone's decision to defend herself by claiming the killing occurred due to the heat of the moment, the State was entitled to submit evidence that tended to show that Boone's intent to inflict fatal harm was one of longer standing.

## II. Evidence of Sudden Heat

During the trial, Boone attempted to show a growing trend of frustration, anger and confrontation on the part of Boone and Campbell. Boone testified that, before going over to Campbell's house, she was upset because Sutton hung the telephone up on her. She then drove to Campbell's home where an argument erupted and Campbell was shot. Boone contends that her angry state of mind can be characterized as sudden heat, which the State must disprove beyond a reasonable doubt.

 Sudden heat is a mitigating factor that reduces otherwise murderous conduct to voluntary manslaughter, but is not an element of voluntary manslaughter.[1] Furthermore, sudden heat requires sufficient provocation to engender passion, which is demonstrated by anger, rage, sudden resentment, or terror that is sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection. *Horan v. State,* 682 N.E.2d 502 (Ind.1997).

 On February 14, 1998, an altercation ensued between Boone and Campbell at Sutton's house that was defused by officers. The record indicates that Boone spent the night at a friend's house where she got some sleep, giving her time to cool off. The next morning she telephoned Sutton, and he hung up on her. Boone then drove to Campbell's home with a gun, and shot her.

Even if she woke up on February 15th still angry, and the telephone call made her more angry, the ride over to Campbell's home should have given Boone ample opportunity to think about the action she was about to undertake. The jury could have concluded that sufficient time elapsed affording Boone time for cool reflection.

---

**1.** *See* Ind.Code Ann. § 35–42–1–3(b) (West Supp.1999).

Furthermore, the jury could have concluded that Boone was making good on her earlier declaration to "get that bitch."

 "Existence of sudden heat is a classic question of fact to be determined by the jury." *Fisher v. State,* 671 N.E.2d 119, 121 (Ind.1996). Enough evidence was introduced for the jury to infer that sudden heat was not present.

### III. The Prosecutor's Cross–Examination

 Boone contends that two questions presented to her were not intended to elicit relevant testimony, but merely to make a highly prejudicial statement to the jury. The two questions were about the same, for example: "But you shot her, knowing that that shot would drain the life right out of her; isn't that correct?" (*See* R. at 914.)

 Boone may well be correct, but this is the sort of call we place in the hands of the judges who try cases day by day. Moreover, not all trial errors provide grounds for reversal. *Monegan v. State,* 721 N.E.2d 243 (Ind.1999). An error is not ground for setting aside a conviction unless such error affects the substantial rights of the parties. *See* Ind. Trial Rule 61; *Fleener v. State,* 656 N.E.2d 1140 (Ind. 1995).

If an error occurred it was harmless at best and does not warrant setting aside the verdict.

### Conclusion

For all that appears, Boone received a fair trial, so we affirm.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.