## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 29 2019, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Troy D. Warner
Public Defender's Office
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Lee Brady, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 29, 2019

Court of Appeals Case No.
18A-CR-1395

Appeal from the St. Joseph
Superior Court

The Honorable Jeffrey L. Sanford,
Judge

Trial Court Cause No.
71D03-1708-F2-10

**Barteau, Senior Judge.**

# Statement of the Case

[1] Appellant Robert Brady, Jr. appeals his conviction of Level 2 felony dealing in methamphetamine.[1] We affirm.

# Issue

[2] Brady presents one issue for our review: whether the State presented sufficient evidence to support his conviction of dealing in methamphetamine.

# Facts and Procedural History

[3] On August 2, 2017, Jermon Gavin contacted his friend, Ron Snyder, about obtaining one and one-half pounds of methamphetamine. Snyder called Josh Sage, who indicated he could provide the methamphetamine for the price of $13,500, to which Snyder added $500 as his fee. Later that same day, Sage and his brother, Brady, arrived at Snyder's house armed with handguns. They hung out with Snyder in the basement during which time they smoked some methamphetamine provided by Sage.

[4] Before going to Snyder's house to obtain the drugs, Gavin and his friends Jesus Pedraza, Benito Pedraza, and Damon Bethel discussed turning the drug purchase into a robbery, and they armed themselves with handguns. On the way, they pointed out Snyder's house to Bethel and then dropped him off around the corner. When they arrived at Snyder's house to purchase the

---

[1] Ind. Code § 35-48-4-1.1(a)(2), (e)(1) (2017).

methamphetamine, Snyder, Sage, and Brady went to the garage to conduct the transaction with them.

[5] The men talked in the garage until Jesus asked Snyder for a scale. Snyder went to the basement to retrieve a scale and then returned to the garage. Sage and Brady produced the drugs as "a team," and Sage, with Brady standing "right next to him," proceeded to weigh the methamphetamine. Tr. Vol. 3, pp. 78, 76. As the drugs were being weighed, Brady stated, "I told you it's all there. It's just a little shaky." *Id.* at 76.

[6] Suddenly, Bethel appeared in the garage and someone was heard to say, "Don't nobody move. Give me that shit." *Id.* at 81. Gun shots were fired, and Snyder ran outside the garage to the side of the house to hide his personal stash of drugs. Brady ran by Snyder and out to the yard with the bag of methamphetamine. *Id.* at 50. At some point, Brady went to the kitchen to wipe down the guns.

[7] As a result of the gunfire, Sage and Bethel were shot, and Bethel died. During their investigation, the police found in the yard a gray plastic grocery bag that contained two Ziploc baggies of what was later determined to be approximately 548 grams of methamphetamine. Testing revealed that a red substance found on both Ziploc baggies and on the gray grocery bag was Brady's blood, likely from an injury he sustained to his hand.

[8] Based upon this incident, Brady was charged with Count I dealing in methamphetamine, a Level 2 felony; Count II attempted dealing in

methamphetamine, a Level 2 felony;[2] and Count III carrying a handgun without a license, a Class A misdemeanor.[3] Following a jury trial, Brady was found guilty as charged on all counts. At sentencing, the court merged Count II into Count I and ordered an aggregate sentence of eighteen and one-half years on Counts I and III. Brady now appeals his conviction of dealing in methamphetamine.

## Discussion and Decision

[9] When an appellant challenges the sufficiency of the evidence of his conviction after a jury verdict, "the appellate posture is markedly deferential to the outcome below." *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016). Upon such a review, we neither reweigh the evidence nor judge the credibility of the witnesses. *Brasher v. State*, 746 N.E.2d 71, 72 (Ind. 2001). Instead, we consider only the evidence most favorable to the verdict and any reasonable inferences drawn therefrom. *Id.* If there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt, we will affirm the conviction. *Dillard v. State*, 755 N.E.2d 1085, 1089 (Ind. 2001).

[10] At trial, the State alleged that Brady committed dealing in methamphetamine in conjunction with Sage, and the court instructed the jury on accomplice liability. In order to convict Brady of dealing in methamphetamine as an accomplice, the

---

[2] Ind. Code §§ 35-41-5-1 (2014), 35-48-4-1.1(a)(2), (e)(1).

[3] Ind. Code § 35-47-2-1 (2017).

State was required to prove beyond a reasonable doubt that he knowingly or intentionally aided, induced, or caused another person to commit this offense. *See* Ind. Code § 35-41-2-4 (1977). To obtain a conviction of dealing in methamphetamine as charged in this case, the State was required to prove beyond a reasonable doubt that (1) Brady (2) possessed with intent to deliver (3) at least 10 grams of methamphetamine. Appellant's App. Vol. 2, p. 26; *see also* Ind. Code § 35-48-4-1.1(a)(2), (e).

[11] A person who aids another in committing a crime is just as guilty as the actual perpetrator. *Lothamer v. State*, 44 N.E.3d 819, 822 (Ind. Ct. App. 2015), *trans. denied*. An accomplice can be charged as a principal for all acts committed in the accomplishment of the crime. *Smith v. State*, 809 N.E.2d 938, 944 (Ind. Ct. App. 2004), *trans. denied*. It is not necessary that the evidence show the accomplice personally participated in the commission of each element of the offense. *Griffin v. State*, 16 N.E.3d 997, 1003 (Ind. Ct. App. 2014). Rather, mere tangential involvement in the crime can be sufficient to convict a person as an accomplice. *Berry v. State*, 819 N.E.2d 443, 450 (Ind. Ct. App. 2004), *trans. denied*. Further, an accomplice is "criminally responsible for everything which follows incidentally in the execution of the common design, as one of its natural and probable consequences, even though it was not intended as part of the original design or common plan." *Griffin*, 16 N.E.3d at 1003.

[12] There is no bright-line rule in determining accomplice liability; rather, the particular facts and circumstances of each case must be considered to determine whether a person participated in the offense as an accomplice. *Castillo v. State*,

974 N.E.2d 458, 466 (Ind. 2012). In order for an accomplice's conviction to stand:

> [T]here must be evidence of his affirmative conduct, either in the form of acts or words, from which an inference of a common design or purpose to effect the commission of a crime may be reasonably drawn. Each participant must knowingly or intentionally associate himself with the criminal venture, participate in it, and try to make it succeed. That said, the State need not show that [he] was a party to a preconceived scheme; it must merely demonstrate concerted action or participation in an illegal act.

*Griffin*, 16 N.E.3d at 1003-04 (internal citations omitted).

[13] While a defendant's presence at the scene or lack of opposition to a crime, standing alone, is insufficient to establish accomplice liability, courts may consider presence in conjunction with other factors to determine whether one acted as an accomplice to a crime. *Tuggle v. State*, 9 N.E.3d 726, 736 (Ind. Ct. App. 2014), *trans. denied*. The four factors relevant to this inquiry are: (1) presence at the scene of the crime, (2) companionship with another at the scene of the crime, (3) failure to oppose commission of the crime, and (4) course of conduct before, during, and after occurrence of the crime. *Id.*

### (1) Presence at the Scene

[14] The evidence shows that Brady arrived at Snyder's house with his brother, Sage. He remained at the house hanging out and smoking methamphetamine with his brother and Snyder and participating in the drug transaction in the garage until it was cut short by gunfire.

### (2) Companionship at the Scene

[15]     The State presented evidence that Brady arrived at Snyder's house with his brother, Sage, whom Snyder had called to obtain drugs. Brady and Sage were both armed with handguns, and they both smoked methamphetamine with Snyder in his basement. When Gavin arrived to purchase the drugs, Brady, Snyder, and Sage all went to the garage to conduct the transaction. Brady remained in the garage talking with everyone, and he and Sage jointly produced the drugs for weighing. In a coordinated endeavor, Brady and Sage weighed the drugs as Brady assured the men the bags contained the full one and one-half pounds of methamphetamine.

### (3) Failure to Oppose Commission of the Crime

[16]     Not only did Brady not oppose the sale of the methamphetamine, he unreservedly participated in the sale in concert with his brother.

### (4) Course of Conduct

[17]     Brady, armed with a handgun, accompanied his brother to Snyder's house to conduct a drug deal. While there, he smoked methamphetamine and collaborated with his brother to weigh the drugs. As gunfire erupted in the garage, Brady took the bags of methamphetamine and ran outside to hide them. He then wiped down his gun and sought a place to conceal it as well. From this evidence, a jury could reasonably conclude that Brady was guilty of dealing in methamphetamine as an accomplice.

[18]     Brady additionally contends the evidence is insufficient to support his conviction because Snyder's testimony "regarding the source of the meth is incredibly dubious and uncorroborated." Appellant's Br. p. 15. Brady argues that Snyder's testimony that Sage provided the methamphetamine and that Snyder was only a middle man does not make sense. Brady suggests that Snyder provided the drugs and that Brady and Sage were Snyder's security men.

[19]     Appellate courts may apply the incredible dubiosity rule to impinge upon a jury's function to judge the credibility of a witness only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Whatley v. State*, 908 N.E.2d 276, 282 (Ind. Ct. App. 2009), *trans. denied*. Application of this rule is rare and is limited to cases where a single witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of guilt. *Id.* The standard to be applied for this rule is whether the testimony is so incredibly dubious or inherently improbable that no reasonable person could believe it. *Fancher v. State*, 918 N.E.2d 16, 22 (Ind. Ct. App. 2009).

[20]     At trial Snyder testified unequivocally that he did not provide the methamphetamine for this sale and that he did not have the methamphetamine at his house at the beginning of the night. He also testified that he contacted Sage to get the methamphetamine for Gavin and that Sage quoted him a price of $13,500. Upon arriving at the house, Sage produced some

methamphetamine that he, Brady, Snyder and others smoked in the basement. When Snyder retrieved the scale, Sage first complained that it was not big enough and then went on to produce and weigh the methamphetamine. Moreover, Snyder's testimony was corroborated by Gavin. Gavin testified that Sage and Brady produced the methamphetamine as a team, that Brady stood with Sage while he weighed the drugs, and that Brady assured the men that it was all there.

[21] It is within the factfinder's province to judge the credibility of the witnesses. *Brasher*, 746 N.E.2d at 73. In doing so, the trier of fact is entitled to determine which version of the incident to credit. *Schmid v. State*, 804 N.E.2d 174, 179 (Ind. Ct. App. 2004), *trans. denied*. Snyder's testimony is not so incredibly dubious or inherently improbable that no reasonable person could believe it. Brady's argument is merely an invitation for this Court to invade the province of the trier of fact by reassessing witness credibility. We decline the invitation.

## Conclusion

[22] For the reasons stated, we conclude there was sufficient evidence to support Brady's conviction of dealing in methamphetamine as an accomplice.

[23] Affirmed.

Robb, J., and Tavitas, J., concur.